1   **WO**

2

3

4

5

6                    **IN THE UNITED STATES DISTRICT COURT**

7                      **FOR THE DISTRICT OF ARIZONA**

8

Equal Employment Opportunity                )
9   Commission,                             )         **CV 05-0618 PCT DGC**
                                             )
10                    Plaintiff,             )
                                             )         **O R D E R**
11          vs.                              )
                                             )
12   GLC Restaurants, Inc. d/b/a McDonald's  )
     Restaurant, an Arizona corporation,     )
13                                           )
                      Defendant.             )
14   _____ )
     Jessica J. Tubandt, Amanda Henry, Tiara )
15   M. Brazle, and Tamara A. Grubbs,        )
                                             )
16                Plaintiffs/Intervenors,    )
           vs.                               )
17                                           )
18   GLC Restaurants, Inc. d/b/a McDonald's  )
     Restaurant , an Arizona corporation,    )
19                                           )
                      Defendant.             )
20   _____ )

21          Pending before the Court are Defendants' motions for summary judgment and motions

22   to strike.  Dkt. ##149, 152, 163, 135, 138, 178, 204.  For the reasons set forth below, the

23   Court will grant in part and deny in part Defendants' motions for summary judgment and

24   deny Defendants' motions to strike as moot.[1]

25

26   _____

27          [1]The Court will deny the request for oral argument because it will not aid the Court's
     decisional process.  *See Mahon v. Credit Bur. of Placer County, Inc.*, 171 F.3d 1197, 1200
28   (9th Cir. 1999).

1    **I.    Background.**

2        The Equal Employment Opportunity Commission ("EEOC") brings this suit on behalf

3    of Tamara Grubbs, Amanda Henry, Jessica Tubandt, Tiara Brazle and a class of four other

4    women – Charlene Hannah, Mary Hellman, Dianna Candelaria, and Candice Jackson-

5    Hannah.  Dkt. #1.  Defendant is GLC Restaurants, Inc. ("GLC").  The EEOC claims the

6    women were subjected to a hostile work environment by GLC in violation of Title VII of the

7    Civil Rights Act of 1964 due to sexual harassment.[2]  The harassment allegedly was caused

8    primarily by assistant manager Steven Ehresman and took place at the Cordes Junction

9    McDonald's Restaurant between January, 2001 and September, 2002.  Additionally, the four

10   named plaintiffs in the EEOC complaint filed suit as Plaintiff-Intervenors, alleging state law

11   claims against GLC, store manager Cindy Keppel, and Ehresman.[3]  Dkt. #58.

12       The record shows that Ehresman began working for GLC in its Campe Verde store

13   in March 1998.  Plaintiffs' Joint Statement of Material Facts ("PSF"), Dkt. # 196, ¶ 3.  After

14   receiving numerous complaints of inappropriate behavior toward female employees, GLC

15   transferred Ehresman to its Cordes Junction store in December 2000.  PSF ¶ 34.  Plaintiffs

16   allege that, beginning in January, 2001, Ehresman exhibited inappropriate behavior toward

17   female employees, including touching their waists, stomachs, breasts, and backs, as well as

18   putting his hands in their pockets, rubbing against them, and making inappropriate

19   comments.  Dkt. #1 at 3.  Plaintiffs allege that they reported Ehresman's conduct to

20   supervisors, including Cindy Keppel, who did little in response until GLC finally terminated

21   Ehresman in September of 2002 for an incident in which he allegedly touched Brazle's

22

23       [2]In its Complaint, the EEOC claims GLC "violated Title VII by discriminating against
24   [female employees] on the basis of their sex, female, and creating a hostile work environment
     because of sex."  Dkt. #1, ¶11.  None of the pleadings indicate that the EEOC is pursuing a
25   disparate treatment claim or a claim based on discrete discriminatory acts.  Thus, the Court
     deems EEOC's sole argument to be that the sexual harassment or discrimination caused the
26   hostile work environment.

27       [3]The Court will refer to both the EEOC and Plaintiff-Intervenors, who brought the
28   state-law claims discussed in Part IV of this order, as Plaintiffs.

1  breast.  Dkt. #58 at 6.  This unresponsiveness forms the basis of EEOC's hostile work

2  environment claim as well as Plaintiffs' twelve-count complaint.

3  **II.    Legal Standard for Summary Judgment.**

4          Summary judgment is appropriate if the evidence, viewed in the light most favorable

5  to the nonmoving party, "show[s] that there is no genuine issue as to any material fact and

6  that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see*

7  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  "Only disputes over facts that might

8  affect the outcome of the suit . . . will properly preclude the entry of summary judgment."

9  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The disputed evidence must be

10  "such that a reasonable jury could return a verdict for the nonmoving party."  *Id.* at 248.

11  Summary judgment may be entered against a party who "fails to make a showing sufficient

12  to establish the existence of an element essential to that party's case, and on which that party

13  will bear the burden of proof at trial."  *Celotex*, 477 U.S. at 322.

14  **III.   Title VII Claims.**

15          **A.    Timing.**

16          GLC argues that some of the EEOC's Title VII claims are time-barred.  Title VII

17  requires a plaintiff raising a hostile work environment claim to file a charge within 300 days

18  of any act that is part of the hostile work environment.  42 U.S.C. § 2000e-5(e)(1); *see Nat'l*

19  *Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 116-17 (2002).  A plaintiff's failure to

20  file a timely complaint forfeits her right to bring a claim at a later time.  *Id.* at 109.

21          The time requirements for hostile work environment claims are less stringent than the

22  requirements for claims of discrete discriminatory acts because hostile work environment

23  claims are "composed of a series of separate acts that collectively constitute one 'unlawful

24  employment practice.'" *Id.* at 117 (citation omitted).  Hostile work environment claims "will

25  not be time barred so long as all acts which constitute the claim are part of the same unlawful

26  employment practice and at least one act falls within the time period."  *Id.* at 122.

27          The EEOC alleges a hostile work environment on behalf of eight people it claims

28  were harassed from January, 2001 to September, 2002.  The four named Plaintiffs filed

1   charges with the EEOC on March 17 and 20, 2003.  Under Title VII, the EEOC can assert

2   hostile work environment claims on behalf of these individuals only if at least one of the acts

3   that contributes to the hostile work environment occurred within the 300 days that preceded

4   those filings – that is, after May 21 and 24, 2002, respectively.  Individual claims based on

5   acts that occurred before that period are time-barred.

6        Class members Charlene Hannah and Mary Hellman allege harassment that occurred

7   entirely before May 21, 2002.[4]  PSF ¶¶ 6-7, 16,  51, 54.   Neither filed a charge with the

8   EEOC.  The EEOC argues, nevertheless, that as long as *some* harassment directed toward

9   *some* of the plaintiffs occurred within 300 days of the filing of the charge, it can bring suit

10  on behalf of any Plaintiff, even if that Plaintiff did not experience harassment within the

11  300-day period.  In support, the EEOC cites *EEOC v. Local 350 Plumbers and Pipefitters*,

12  which allowed a challenge to a union's allegedly discriminatory policy using evidence of

13  discrimination both within and outside the 300-day period.  998 F.2d 641, 644-45 (9th Cir.

14  1993).  Reliance on this case is misplaced, however, because the evidence of discrimination

15  outside the 300-day period was used only to support the claims of a plaintiff who had alleged

16  discrimination within the 300-day period.  *Local 350* differs from this case, in which the

17  EEOC attempts to use some Plaintiffs' timely charges to support other Plaintiffs' entirely

18  untimely claims.

19       The EEOC next argues that because it may seek class-wide relief without being

20  subject to the class action requirements of Federal Rule of Civil Procedure 23, it has the

21  authority to bring suit on behalf of any aggrieved individual, no matter when the

22  discrimination occurred.   Dkt. #193 at 11 (discussing *General Telephone Co. of the*

23  *Northwest, Inc. v EEOC*, 446 U.S. 318, 331 (1980)).  The EEOC is correct that it has broader

24  standing than a private class representative, but its standing is not unlimited.  The two cases

25  the EEOC cites in support are distinguishable.  While *EEOC v. Gurnee Inn Corp.* stated in

26

27       [4]The record is unclear as to when during 2002 Tamara Grubbs was harassed.  There
    is the possibility that she was harassed after May 21, 2002.  If it is proven that she was not

28  harassed after May 21, 2002, her claims will be time-barred.

a footnote that the EEOC's standing is "not limited to discriminations that the charging party had standing to raise," it specifically noted that the defendant had not raised a timeliness challenge to plaintiffs' discrimination claims. 914 F.2d 815, 819 n.6 (7th Cir. 1990). The second case, an unpublished district court case from Wisconsin, does not involve hostile work environment claims, but instead deals with backpay awards for discrimination in hiring. *See EEOC v. Newspapers, Inc.*, 39 Fair Empl. Prac. Case (BNA) 891 (E.D. Wis. 1985).

The EEOC next cites *Morgan* for the proposition, with which this Court agrees, that "for the charge to be timely, the employee need only file a charge within . . . 300 days of any act that is part of the hostile work environment." 536 U.S. at 118. *Morgan*, however, dealt with the same plaintiff alleging discriminatory behavior both before and after the beginning of the 300-day limitations period. *Id.* at 122. *Morgan* does not support the EEOC's argument that discrimination toward Charlene Hannah and Mary Hellman, though not occurring after May 21, 2002, is actionable because the claims of other class members involve discrimination occurring after that date. This argument is unsupported by existing case law. The Court accordingly concludes that the EEOC's hostile work environment claims on behalf of Charlene Hannah and Mary Hellman are time-barred.

The hostile work environment claims of class members Dianna Candelaria and Candice Jackson-Hannah are not barred. Even though they did not file charges with the EEOC, some of the misconduct they allege on the part of GLC occurred after May 21, 2002. *See Williams v. Owens-Illinois, Inc.*, 665 F.2d 918, 923 (9th Cir. 1982) (finding non-filing class members governed by the statute of limitations of class representatives).

Defendants argue that the statement in Plaintiffs' amended complaint that the alleged harassment did not begin until late 2001 is a judicial admission that no harassment occurred before 2001, and, therefore, that any events occurring before 2001 may not be considered by the Court. Dkt. #58, ¶ 24. The Court rejects this argument. The Plaintiffs' complaint was merely stating that Grubbs, Tubandt, Brazle, and Henry were not harassed before late 2001. Nothing in the complaint is an admission that GLC or Ehresman did not violate Title VII before late 2001. Indeed, the EEOC's complaint alleges harassment beginning in January

1    2001.  Dkt. #1 at 3.  Therefore, to the extent that events occurring before late 2001 are

2    relevant to Plaintiffs' claims that are not time-barred, such events will be permitted.

3          The Court will grant summary judgment to GLC on the claims of Charlene Hannah

4    and Mary Hellman.

5          **B.    Hostile Work Environment.**

6                **1.    Prima Facie Case.**

7          To prevail on a Title VII hostile work environment claim, a plaintiff must show that

8    (1) she was subjected to verbal or physical conduct of a sexual nature, (2) the conduct was

9    unwelcome, and (3) the conduct was sufficiently severe or pervasive to alter the conditions

10   of her employment and create an abusive work environment.  *See Vasquez v. County of Los*

11   *Angeles*, 349 F.3d 634, 642 (9th Cir.  2003).  To determine whether the conduct was

12   sufficiently severe or pervasive, courts look at all the circumstances, "including the

13   frequency of the discriminatory conduct; its severity; whether it is physically threatening or

14   humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an

15   employee's work performance."   *Faragher v. City of Boca Raton*, 524 U.S. 775, 787-88

16   (1998) (internal quotations omitted).

17         The Ninth Circuit has held that "the required showing of severity or seriousness of the

18   harassing conduct varies inversely with the pervasiveness or frequency of the conduct."

19   *Ellison v. Brady*, 924 F.2d 872, 878 (9th Cir. 1991) (citing *King v. Bd. of Regents of Univ.*

20   *of Wis. Sys.*, 898 F.2d 533, 537 (7th Cir. 1990)).  Thus, multiple acts that individually might

21   not create a hostile work environment may cumulatively amount to a violation of Title VII.

22   Prior incidents of which a plaintiff is unaware cannot contribute to a hostile work

23   environment with respect to that plaintiff.  *Brooks*, 229 F.3d at 924.

24         A reasonable jury could find that the alleged harassment in this case was severe and

25   pervasive toward the six Plaintiffs whose claims are not time-barred.  Tubandt alleges that

26   Ehresman touched her waist, massaged her, put his hands in her pockets, lifted up her shirt

27   and touched her belly.  PSF ¶¶ 144-170.  On one occasion, he told her he wanted to spank

28   her.  On another, he told her he wanted to lay her down and spread her legs open.  *Id.* at

1  ¶ 158.  The harassment continued even after she asked him to stop and reported him to
2  supervisors.  *Id.*

3      Henry alleges that Ehresman touched her shoulder, hand, belly, back, sides, and thigh,
4  and claims she asked him several times to stop.  *Id.* at ¶ 187-89, 198.  She complained to shift
5  manager Joe Hubbard, who told her he would report the incidents and then said he had gone
6  to upper management, but "'as always' nothing had been done and nothing was going to be
7  done."  *Id.* at ¶ 193.  Henry knew about harassment of other employees and had heard that
8  Keppel never acted on the complaints.  *Id.* at ¶¶ 195, 199-200.

9      Brazle alleges that Ehresman touched her leg, shoulder, hands, and breast.  *Id.* at
10  ¶¶ 230-276.  She claims that she told him to stop and reported his conduct to Keppel.  *Id.* at
11  ¶¶ 247-48.    Additionally,  she  heard  Ehresman  touch  and  address  other  employees
12  inappropriately.  *Id.* at ¶¶ 250-54, 261.

13      Grubbs alleges that Ehresman told her she was pretty, rubbed her hands, touched her
14  hair, rubbed her back, and told dirty jokes in her presence.  *Id.* at ¶ 78.  She alleges similar
15  physical contact with other employees with whom she worked, as well as similar pleas to
16  management to correct the problem.  *Id.* at ¶¶ 78-119.  At one point, Ehresman reached into
17  her pocket, causing Grubbs to pull out both her pockets.  Ehresman then told her he wanted
18  to "lick between the bunny ears."  *Id.* at ¶ 90.  The inappropriate conduct occurred nearly
19  every time she worked with Ehresman.  *Id.* at ¶ 101.

20      Candelaria was significantly older than the other Plaintiffs, but was also subjected to
21  sexual harassment.  She heard Ehresman make sexually offensive jokes.  *Id.* at ¶ 283.  On at
22  least five occasions, Ehresman stood so close to her that if she moved she would have to
23  brush against his penis, and every time this happened she would tell him that he was making
24  her uncomfortable.  *Id.* at ¶¶ 285-86.  He made comments about breaking into her house and
25  having sex with her and told her that her buttocks had a "nice shape" and that her breasts
26  were the "perfect size for [his] hands but they're too much for [his] mouth."  *Id.* at ¶¶ 287-
27  298.  She had heard of others' complaints and of Keppel's unresponsiveness.  *Id.* at ¶ 302.

28

1    Jackson-Hannah alleges that employee Juan Cruz would push her into the walk-in

2   freezer, kiss her, touch her, and try to grab her breasts. *Id*. at ¶¶ 314, 317. She further alleges

3   that Joe Hubbard made sexual comments to her. *Id*. at ¶¶ 321-22. She claims that part of the

4   reason she did not complain to management was that she had heard about Ehresman's

5   behavior and how GLC had done little to try to stop it until it terminated him in September,

6   2002. *Id*. at ¶ 319.

7    Taking the facts in the light most favorable to Plaintiffs, it is clear that Ehresman,

8   Cruz, and others engaged in repeated and unwanted sexual advances toward Plaintiffs.

9   Ehresman's behavior was especially severe in light of the age disparity between him and five

10   of the Plaintiffs. At the time of the alleged harassment, he was between forty-three and forty-

11   five years old, while all Plaintiffs except Candelaria were minors. Taking into account the

12   totality of the circumstances, a reasonable jury could find in the EEOC's favor on this claim.

13   The Court will deny GLC's motion for summary judgment on the EEOC's Title VII claim.

14    **2.    *Faragher/Ellerth* Affirmative Defense.**

15    When a supervisor is responsible for harassment that results in a tangible employment

16   action, his employer may be held strictly liable for the employee's unlawful conduct. *See*

17   *Faragher*, 524 U.S. at 777; *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998). If

18   there has not been a tangible employment action, the *Faragher/Ellerth* affirmative defense

19   is available to the employer. To avail itself of this defense, the employer must show (1) that

20   it exercised reasonable care to prevent and promptly correct harassing behavior, and (2) that

21   the women unreasonably failed to take advantage of any preventive or corrective

22   opportunities provided by the defendant or unreasonably failed to otherwise avoid harm. *Id.*

23   at 765.

24    Whether GLC can satisfy the first prong of the *Faragher/Ellerth* defense is a question

25   of fact. There is ample evidence in the record from which a reasonable jury could find that

26   GLC failed to correct harassment promptly when it transferred Ehresman instead of firing

27   him, then gave him a final warning, yet merely reprimanded him after the first allegation of

28   harassment in the Cordes Junction store. Plaintiffs' allegations regarding Ehresman's

constant harassment of Julie Downing and Holly Procunier at the Camp Verde store between 1998 and 2000 are relevant to this inquiry.  PSF ¶¶ 6-42.  While this evidence may not be used to establish a hostile work environment because none of the Cordes Junction employees knew of Ehresman's previous harassment, the Ninth Circuit has ruled that "lack of adequate discipline might be a relevant consideration in assessing the employer's liability once a hostile work environment is shown to exist."  *Brooks*, 229 F.3d at 925, n.5.

Moreover, whether GLC used reasonable care to prevent later harassment once it transferred Ehresman to Cordes Junction is also a question of fact.  Plaintiffs suggest that the management – regional manager Eric Coleman, and managers Chaar Boyd, Kathy O'Sullivan, Keppel, and Hubbard – were all at various points apprised of Ehresman's behavior in his new capacity as assistant manager at Cordes Junction.  PSF ¶¶ 38-39, 80, 92-96, 102-109, 111, 157, 193-94, 248-50, 262-68, 272, 325-28, 331.  From this, a reasonable jury could conclude that GLC fails the first requirement of the affirmative defense.  Factual issues preclude the Court from granting summary judgment on the basis of the *Faragher/Ellerth* defense.[5]

### C.    Constructive Discharge.

To prevail on a claim for constructive discharge, a plaintiff must demonstrate "that the abusive working environment became so intolerable that her resignation qualified as a fitting response."  *Pennsylvania State Police v. Suders*, 542 U.S. 129, 134 (2004). Defendants argue that because Brazle resigned after Ehresman had been suspended, there were no grounds for her to believe reasonably that allegedly intolerable working conditions would continue.  But whether Brazle knew Ehresman had been suspended is a question of fact.  Moreover, even if she had known, she did not know that the suspicion and investigation would result in his dismissal; GLC could have decided to bring him back to work.  Thus,

---

[5]Because GLC cannot prevail on the *Faragher/Ellerth* affirmative defense at the summary judgment stage, the Court need not decide if any Plaintiff suffered a tangible employment action that would preclude use of the affirmative defense.

1   whether Brazle acted reasonably in finding her work environment intolerable is a question
2   that must be resolved by the jury.

### D. Punitive Damages.

4   For Plaintiffs to recover punitive damages, they must prove that GLC intentionally
5   discriminated with malice or indifference to their federally protected rights. *See Kolstad v.*
6   *American Dental Ass'n*, 527 U.S. 526, 534 (1999). The conduct complained of need not be
7   egregious. Rather, the employer may be liable for punitive damages "in any case where it
8   'discriminate[s] in the face of a perceived risk that its actions will violate federal law.'"
9   *Passantino v. Johnson & Johnson Consumer Prods., Inc.*, 212 F.3d 493, 515 (9th Cir. 2000)
10  (citing *Kolstad*, 527 U.S. at 536). An employer may escape liability when it undertakes
11  "good faith efforts at Title VII compliance." *Kolstad*, 527 U.S. at 544. Existence of a
12  discrimination policy alone, however, is insufficient. The employer must implement the
13  policy. *Swinton v. Potomac Corp.*, 270 F.3d 794, 810-11 (9th Cir. 2001). The Ninth Circuit
14  has stated that Title VII would be undermined if employers could escape punitive damages
15  merely by having a sexual harassment policy that was never implemented. *Passantino*, 212
16  F.3d at 517.

17  GLC argues that it had a policy against discrimination and claims that it disseminated
18  and explained the policy to its employees. Plaintiffs allege GLC failed to explain its non-
19  discrimination policy to new employees, failed to post the "8-in-1" sexual harassment
20  prevention poster as required by the company, failed to provide Plaintiffs a sufficient avenue
21  to complain, and failed to train its supervisors according to company policy. *See, e.g.*, PSF
22  ¶¶ 86-87, 139, 141-43, 184, 232, 234, 239. Moreover, there are questions of fact regarding
23  the handling of Plaintiffs' complaints. Tubandt claims she told manager Chaar Boyd about
24  Ehresman; Henry says she told shift manager Joe Hubbard; Brazle asserts she told Keppel;
25  Grubbs claims she spoke with O'Sullivan, Keppel, and Coleman about Ehresman. *Id.* at ¶¶
26  80, 92-93, 102, 157, 193-94, 248-50. If Plaintiffs are correct, their complaints fell on deaf
27  ears and GLC did little to stop Ehresman from victimizing them. A jury must decide whether
28  to award punitive damages to Plaintiffs under Title VII and 42 U.S.C. § 1981a.

1    **IV.    Plaintiffs' State Law Claims.**

2         **A.    Negligent Hiring and Retention - Count II.**

3         Plaintiffs contend in Count II of their amended complaint that GLC "negligently

4    employed, retained, failed to properly supervise and/or failed to monitor [Ehresman] . . . and

5    failed to provide adequate warning to Plaintiffs or their families." Dkt. # 58, ¶45. "It is well

6    settled that work-related injury claims are generally redressed exclusively under Arizona's

7    workers' compensation scheme." *Gamez v. Brush Wellman, Inc*., 34 P.3d 375, 378 (Ariz.

8    App. 2001).   An exception to this rule exists when the employee's injury results from an

9    employer's willful misconduct, defined as "an act done knowingly and purposely with the

10   direct object of injuring another." A.R.S. §§ 23-1022(A)-(B); *Mosakowski v. PSS World*

11   *Medical, Inc.*, 329 F.Supp.2d 1112, 1129 (D. Ariz. 2003).

12        The standard for willful misconduct is high.  It is more than gross negligence and

13   even excludes some acts of intentional or reckless misconduct. *Mosakowski*, 329 F.Supp.2d

14   at 1130.  In *Mosakowski*, the plaintiff claimed that the employer defendant had negligently

15   supervised its workplace, resulting in the plaintiff being subjected to a hostile work

16   environment. *Id*. at 1131.  The court concluded that "a negligence claim is precluded by the

17   [Arizona'] worker's compensation statutes while a claim for intentional infliction of

18   emotional distress is not precluded."   *Id*.   Concluding that "Arizona law precludes an

19   employee from bringing a tort action based on negligent hiring and negligent retention

20   against their employer," the court granted summary judgment to the employer. *Id*.

21        Plaintiffs cite *Ford v. Revlon* for the proposition that inaction by GLC is not an

22   accident that would bring the conduct under the coverage of the worker's compensation laws.

23   734 P.2d 580 (Ariz. 1987).  They claim "there is no worker's compensation coverage and,

24   therefore, no preemption." Dkt. #195 at 7. Yet Plaintiffs present no evidence that they have

25   been denied worker's compensation because the conduct was not accidental.  Moreover,

26   *Ford* is inapposite because the claim for intentional infliction of emotional distress the court

27   addressed required plaintiff to show intent to harm on the part of the employer. *Ford*, 734

28

P.2d at 585.  Plaintiffs offer no evidence to support a claim that GLC intentionally tried to harm them.

The Court agrees that Plaintiffs' negligent employment and retention claim is preempted by the Arizona worker's compensation laws.  Accordingly, the Court will grant summary judgment to GLC on Count II.

### B.   Vicarious Liability - Counts V, VII, IX.

Defendants argue that GLC is not held vicariously liable for the acts of Ehresman. For an employer to be held liable, an employee must have acted within the scope of his employment, been subject to the employer's control or right of control, and acted in furtherance of the employer's business.  *State v. Shallock*, 941 P.2d 1275, 1281 (Ariz. 1997) (vicarious liability based on Restatement (Second) of Agency § 219 *et seq*.)  Normally, an employee acts within the scope of employment when he performs the kind of work he was hired to perform, his conduct occurs substantially within authorized time and space limits, and his conduct is motivated, at least in part, by a purpose to serve the employer.  *Id*.

Defendants claim that Arizona law does not support vicarious liability in a sexual harassment case because such actions are outside the scope of employment.  *See Smith v. American Express Travel Related Serv. Co.*, 876 P.2d 1166, 1170-71 (Ariz. Ct. App. 1994). In *Smith*, the court affirmed the grant of summary judgment to an employer on a respondeat superior claim after concluding that "no evidence exists from which a reasonable juror could conclude that [the employer] knew about [an individual's] sexual misconduct and ratified it." *Id.* at 1172.  *Smith* differs from this case because Plaintiffs have offered evidence from which a reasonable jury could conclude that GLC knew about Ehresman's sexual misconduct and failed to act.

The Arizona Supreme Court's decision in *Shallock* is more instructive.  The court acknowledged that sexual harassment activities would never be directly within the scope of employment as no employer would explicitly authorize such behavior.  *Shallock*, 941 P.2d at 1282.  Nevertheless, it determined that "many factors are to be considered in determining whether conduct not expressly authorized is so incidental as to be within course and scope

1   [of employment]." *Id.* (citing the list of factors in Restatement (Second) of Agency §

2   229(2)(a)-(j). Because the employer had known for years about the employee's on-the-job

3   harassment and had done nothing about it, the court concluded that "a jury might well choose

4   not to believe claims that these acts were unauthorized and outside the course of employment

5   when the employer permitted them to occur and recur over a long period at its place of

6   business and during business hours." *Id.* at 1283. The court reversed the lower court's grant

7   of summary judgment on the sexual harassment claim.

8           Plaintiffs' evidence suggests that GLC knew for years that Ehresman engaged in

9   sexual harassment in the workplace. Even though GLC did not expressly authorize such

10   harassment, a jury might find that Ehresman's conduct was incidental enough to his work

11   that it falls within the scope of employment. The Court will deny GLC's motion for

12   summary judgment on Counts V, VII, and IX to the extent that it denies summary judgment

13   to Ehresman on Counts IV, VI, and VIII, respectively. The Court will address each of those

14   counts in turn.

15           **C.      Intentional Infliction of Emotional Distress - Count IV.**

16           To recover for intentional infliction of emotional distress ("IIED") in Arizona, a

17   plaintiff must prove that (1) the defendant's conduct was extreme and outrageous, (2) the

18   defendant either intended to cause emotional distress or recklessly disregarded the near

19   certainty that distress would result from the conduct, and (3) the conduct caused the plaintiff

20   severe emotional distress. *See Lucchesi v. Stimmell*, 716 P.2d 1013, 1015-16 (Ariz. 1986)

21   (citing *Watts v. Golden Age Nursing Home*, 619 P.2d 1032, 1035 (Ariz. 1980)).

22           Under the first element, a plaintiff "may recover for [IIED] only where the

23   defendant's acts are 'so outrageous in character and so extreme in degree, as to go beyond

24   all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a

25   civilized community.'" *Patton v. First Fed. Sav. & Loan Ass'n of Phoenix*, 578 P.2d 152,

26   155 (Ariz. 1978) (quoting *Cluff v. Farmers Ins. Exch.*, 460 P.2d 666, 668 (Ariz. 1969)). It

27   is not enough "that the defendant has acted with an intent which is tortious or even criminal,

28   or that he has intended to inflict emotional distress, or even that his conduct has been

1    characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to

2    punitive damages for another tort."  Restatement (Second) of Torts, § 46 cmt. d (1965).  It

3    is "extremely rare to find conduct in the employment context that will rise to the level of

4    outrageousness necessary to provide a basis for recovery for the tort of intentional infliction

5    of emotional distress." *Mintz v. Bell Atlantic Sys. Leasing*, 905 P.2d 559, 563 (Ariz. App.

6    1995) (internal citations omitted).   Specifically, conduct that creates a hostile work

7    environment under Title VII "occurs at a much lower threshold of inappropriate conduct than

8    the threshold required for the tort of intentional infliction of emotional distress" *Stingley v.*

9    *Arizona*, 796 F.Supp. 424, 431 (D. Ariz. 1992)*;  Coffin v. Safeway*, No. CV 03-0470-PHX-

10   NVW (D. Ariz. August 25, 2005).

11        Ehresman's sexual harassment, if as alleged by Plaintiff, was deplorable.  It does not,

12   however, fall within "that quite narrow range of 'extreme and outrageous' conduct needed

13   to establish a claim of emotional distress."  *See Watts*, 619 P.2d at 1035.

14        Moreover, Plaintiffs fail to satisfy the third prong of an IIED claim – that they

15   suffered severe emotional distress. Because "severe emotional distress" is not readily capable

16   of precise legal definition, Arizona courts apply a case-by-case analysis with respect to these

17   determinations.  *See Lucchesi*, 716 P.2d at 1016 *(*citing *Midas Muffler Shop v. Ellison*, 650

18   P.2d 496, 499 (Ariz. Ct. App. 1982)); *Lindsey v. Dempsey*, 735 P.2d 840, 844 (Ariz. Ct. App.

19   1987).  "A line of demarcation should be drawn between conduct likely to cause mere

20   'emotional distress' and that causing 'severe emotional distress.'"  *Midas Muffler Shop v.*

21   *Ellison*, 650 P.2d 496, 501 (Ariz. App. 1982).  Crying, being stressed and upset, and having

22   headaches is not enough to establish severe harm.  *Spratt v. Northern Automotive Corp.*, 958

23   F.Supp. 456, 461 (D. Ariz. 1996).  Nor is difficulty sleeping sufficient.  *Midas Muffler Shop*,

24   650 P.2d at 501.  Shock, stress, moodiness, and estrangement from friends and coworkers is

25   not severe.  *Bodett v. Coxcom*, 366 F.3d 736, 747 (9th Cir. 2004).  In contrast, anxiety that

26   results in physical symptoms such as high blood pressure, chest pains, fatigue, and dizziness

27   constitutes severe emotional distress.  *See Ford*, 734 P.2d at 583.  Anger and depression

28   coupled with physical ailments such as headaches and hemorrhoids as a result of losing

1  contact with one's child has also been found to constitute severe emotional distress. *See*

2  *Pankratz v. Willis*, 744 P.2d 1182, 1191 (Ariz. App. 1987). To determine whether any of the

3  Plaintiffs raise a viable claim of intentional infliction of emotional distress, it is necessary

4  to examine their individual symptoms.

5  **1.    Tamara Grubbs:**

6  Grubbs asserts that Ehresman's conduct caused her to suffer from depression, dreams

7  of Ehresman touching her, sleeping problems and eating problems. She claims her

8  schoolwork suffered. She received treatment for depression from her doctor, who prescribed

9  sleeping pills. She was issued a prescription for anti-depressants and referred to a counselor,

10  but did not see the counselor. She claims the dreams occurred in 2001 and 2002 and a few

11  times from 2003-2005. PSF ¶¶ 121-28.

12  **2.    Jessica Tubandt:**

13  Tubandt claims that Ehresman's conduct caused her not to trust men and triggered

14  recurrence of a dream that began when her stepfather molested her as a child. She has had

15  the dream ten to fifteen times since leaving GLC. She has lost sleep and occasionally sleeps

16  in her grandmother's bed. When she worked with Ehresman, her stomach hurt. Her family

17  suggested she go to a psychiatrist, but she did not. She does not like to work anymore. *Id.*

18  at ¶¶ 171-181.

19  **3.    Amanda Henry:**

20  Henry alleges that Ehresman's conduct caused her to become anxious, lose sleep, and

21  dream about Ehresman chasing her. She quit a subsequent job at Sears because Ehresman

22  saw her there and she believed he would come back. Her family suggested she seek

23  counseling, but she did not. She did not let people touch her for six months after Ehresman

24  was terminated. She had what she believes was a panic attack. Her parents told her she

25  seemed depressed. *Id.* at ¶¶ 201-06, 218-20.

26  **4.    Tiara Brazle:**

27  Brazle claims that Ehresman's actions triggered a bloody nose, stomach problems, and

28  vomiting four or five times. She says she is not as outgoing as a result of the harassment.

1    Her mother believes she has lost sleep, gained weight, and not wanted men to touch her.  *Id*.

2    at ¶¶ 277-279.

3           In sum, Plaintiffs' emotional effects approach the line of demarcation between

4    emotional distress and severe emotional distress, but they do not cross it.  Plaintiffs have

5    cited no cases that have found similar symptoms to rise to the level of severe emotional

6    distress.  The Court will grant summary judgment for Ehresman on Count IV and for GLC

7    on Count V.

8           **D.     Intentional Infliction of Emotional Distress - Count III.**

9           In Arizona, an employer may be held independently liable for intentional infliction

10   of emotional distress for failure to respond to an employee's charges of sexual harassment

11   even if the individual committing the harassment is not liable.  *Ford*, 734 P.2d at 584.  In

12   *Ford*, the plaintiff complained about her supervisor's behavior to the local plant's

13   comptroller, three local personnel managers, a plant manager, and a national human

14   resources manager.  *Id*. at 582.  The complaints reached as high as the corporate vice-

15   president, who determined the harassment was not a national problem and should be handled

16   by the local Phoenix plant.  *Id*.  Thirteen months after the initial complaint, the harassing

17   supervisor was issued a letter of censure, but was not otherwise disciplined until he was

18   terminated after the plaintiff attempted suicide as a result of his harassment.  *Id*. at 583.

19          Unlike the corporate defendant in *Ford*, GLC took some steps to discipline Ehresman.

20   It transferred him from Camp Verde to Cordes Junction after employees complained about

21   his behavior.  PSF ¶¶ 34-37.  GLC then reprimanded him after Charlene Hannah complained

22   about his behavior to Keppel.  *Id*. at ¶¶ 47-51.  Finally, it suspended and then terminated him

23   following Brazle's complaint that he touched her breast.  *Id*. at ¶ 5; Dkt. #193 at 10.  These

24   efforts distinguish GLC's behavior from the employer's behavior in *Ford*.  While these

25   efforts are insufficient to support summary judgment in favor of GLC on the Title VII claim,

26   they do serve to mitigate the alleged outrageousness of GLC's actions.  The failure to

27   discipline Ehresman sooner may have resulted from corporate incompetence or gross

28   negligence, but it does not amount to conduct that is "so outrageous in character and so

1   extreme in degree, as to go beyond all possible bounds of decency." *Patton*, 578 P.2d at 155.

2   Moreover, as already noted, Plaintiffs' emotional distress was not severe enough to support

3   an IIED claim.  The Court will grant GLC's motion for summary judgment on Count III.

4           **E.**      **Assault/Battery - Counts VI and VIII.**

5           Claims for assault and battery must involve contact that would offend a reasonable

6   person.  *See Revised Arizona Jury Instructions* (4th ed.) Intentional Torts 1 (Assault), 2

7   (Battery).  To prove assault, Plaintiffs must show that Ehresman acted with the intent to (1)

8   cause a harmful or offensive contact with another person, or (2) cause another person

9   apprehension of an immediate harmful or offensive contact.  *See Revised Arizona Jury*

10  *Instructions* (4th ed.) Intentional Torts 1 - Assault (citing to *Restatement (Second) of Torts*

11  (1965) §§ 21-34); *Garcia v. United States*, 826 F.2d 806, 810 n.9 (9th Cir. 1987).  To prove

12  battery, Plaintiffs must show not only that Ehresman acted with the intent to (1) cause a

13  harmful or offensive contact with another person, or (2) cause another person apprehension

14  of an immediate harmful or offensive contact, but also that the contact occured.  *See Revised*

15  *Arizona Jury Instructions* (4th ed.) Intentional Torts 2 - Battery (citing *Restatement (Second)*

16  *of Torts* (1965) §§ 13-20); *Garcia*, 826 F.2d at 810 n.9.

17          Ehresman claims that his conduct was "innocuous and inherent in every similar

18  working situation."  Dkt. # 149 at 26.  That assertion is patently wrong.  Each Plaintiff has

19  presented facts that a reasonable jury could use to find that Ehresman assaulted and battered

20  her.  While some of Ehresman's behavior took the form of sexually inappropriate comments

21  that could not meet the elements of battery, his actions also included multiple instances of

22  touching.  The evidence shows that the work at GLC could be done without physical contact

23  at all, let alone the unwanted and utterly inappropriate contact Plaintiffs allege.  *See, e.g.* PSF

24  ¶ 89.  The Court will deny summary judgment on Counts VI, VII, VIII, and IX.

25          **F. Tortious Interference with Contract - Count X.**

26          Plaintiffs claim that Ehresman tortiously interfered with their contracts with GLC by

27  interfering with the expectancy that there would be no sexual harassment on the job.  The

28  elements for tortious interference with contract are (1) existence of a valid contractual

relationship, (2) knowledge of the relationship on the part of the interferor, (3) intentional interference inducing or causing a breach, (4) resultant damage to the party whose relationship or expectancy has been disrupted, and (5) proof that the defendant acted improperly.  Restatement (Second) of Torts § 766 (adopted by *Wagenseller v. Scottsdale Memorial Hospital*, 710 P.2d 1025, 1043 (Ariz. 1985)).  Ehresman argues that he cannot be held liable because, as an employee of GLC, he was not a third party who could interfere with Plaintiffs' contracts with GLC.  *See Payne v. Pennzoil Corp.*, 672 P.2d 1322, 1326-27 (Ariz. Ct. App. 1983).  While Arizona law is not entirely clear on the matter, *Wagenseller* stands for the proposition that a person acting in the scope of employment may nonetheless be found liable for tortious interference if his behavior was improper.  Ehresman's conduct was improper, so the question is whether he interfered with a contract or business expectancy.

Plaintiffs claim Ehresman interfered with the business expectancy that they would not be subjected to sexual harassment on the job.  They claim that GLC's employment manual created an expectation that there would be no sexual harassment.  The Arizona Supreme Court has held, however, that a statement in an employee handbook "is contractual only if it discloses a promissory intent or is one that the employee could reasonably conclude constituted a commitment by the employer."  *Demasse v. ITT Corp.*, 984 P.2d 1138, 1143 (Ariz. 1999).  A mere description of present policies is not a promise on which an employee could reasonably rely.  *Id.*  Employee guidelines generally fall into the non-promissory category.  *Id.*

GLC's employment handbook notes that sexual harassment is forbidden.  Dkt. #159, Ex 2.  It encourages employees to report incidents of sexual harassment and commits to investigate such reports.  *Id.*  Nothing in the handbook, however, promises that no employee will ever experience sexual harassment.  Even if the handbook promises to investigate reports, there is no way Ehresman could have interfered with this expectancy, because he would not have been charged with investigating complaints against himself.  Accordingly, the Court will grant summary judgment to Ehresman on Count X.

1

### G.     Tortious Interference with Contract - Count XI.

2          As noted above, *Wagenseller* rejected the notion that a supervisor can never be liable

3    for tortious interference with contract.  *See Wagenseller*, 710 P.2d at 1043.  Even though a

4    supervisor who acted improperly may be held liable for the tort, Keppel's inaction does not

5    amount to tortious interference with Plaintiff-Intervenor's employment contracts.  As the

6    Ninth Circuit has stated: "[w]e are aware of no authority for the counter-intuitive proposition

7    that nonfeasance can amount to interference[.]" *Caudle v. Bristow Optical Company, Inc.*,

8    224 F.3d 1014, 1024 (9th Cir. 2000) (affirming district court's grant of directed verdict on

9    interference with contract claim when the evidence showed only that supervisor failed to

10   assist plaintiff to avoid termination).  Nothing in the record indicates that Keppel did

11   anything but fail to discipline Ehresman.  While such inaction supports the EEOC's hostile

12   work environment claim, it does not amount to tortious interference with contract.  The Court

13   will grant summary judgment to Keppel on Count XI.

### H.     Aiding and Abetting - Count XII.

14

15         Aiding and abetting requires that (1) the primary tortfeasor commit a tort that causes

16   injury to the plaintiff, (2) the defendant know that the primary tortfeasor's act constitutes a

17   breach of duty, and (3) the defendant substantially assist or encourage the primary tortfeasor

18   in achieving the breach.  *Restatement (Second) of Torts* § 876(b) (1979); *Wells Fargo Bank*

19   *v. Arizona Laborers, Teamsters, and Cement Masons Local No. 395 Pension Trust Fund*, 38

20   P.3d 12, 23 (Ariz. 2002).  Ehresman's alleged assault and battery of Plaintiffs satisfies the

21   first element.  Regarding the second element, it is unclear if Keppel knew that Ehresman's

22   acts constituted sexual harassment, although that would be a question for the jury.  The third

23   element, substantial assistance, requires "more than a little aid." *Wells Fargo*, 38 P.3d at 26.

24   Plaintiffs have not provided facts that show that Keppel substantially assisted or encouraged

25   Ehresman in committing the tort.  All they allege is that Keppel did not respond to their

26   complaints about Ehresman.  This lack of response may mean that Keppel was a poor

27   manager of the Cordes Junction store and may help Plaintiffs overcome an affirmative

28

1  defense to their Title VII claims, but it does not rise to the level of substantial assistance.

2  The Court will grant summary judgment in favor of Keppel on Count XII.

3          **I.**    **Punitive Damages.**

4       Punitive damages on state claims are appropriate when a defendant acts with an "evil

5  mind" and engages in "consciously malicious or outrageous acts of misconduct where

6  punishment and deterrence is both paramount and likely to be achieved." *Linthicum v.*

7  *Nationwide Life Insurance Co.*, 723 P.2d 675, 679 (1986).  In resolving claims for punitive

8  damages, "[c]ourts consider 'the nature of the defendant's conduct, including the

9  reprehensibility of the conduct and the severity of the harm likely to result, as well as the

10  harm that has occurred, the duration of the misconduct, the degree of defendant's awareness

11  of the harm or risk of harm and any concealment of it.'" *Murcott v. Best W. Int'l, Inc.*, 9 P.3d

12  1088, 1100 ¶ 68 (Ariz. Ct. App. 2002) (citing *Thompson v. Better-Bilt Aluminum Prods. Co.*,

13  832 P.2d 203, 211 (Ariz. 1992)) (internal alterations omitted).  The plaintiff must prove the

14  right to punitive damages by clear and convincing evidence. *Linthicum*, 723 P.2d at 681.

15       Ehresman alleges that because he testified that he did not intend to cause harm to the

16  Plaintiffs, he lacked the requisite evil mind and his acts were not malicious or outrageous.

17  This is a question for the jury.  The Plaintiffs' facts demonstrate that Ehresman had a history

18  of sexual harassment that resulted in his transfer from Camp Verde to Cordes Junction.  He

19  was given a reprimand by Cindy Keppel for grabbing Charlene Hannah in 2001.  PSF ¶¶ 50-

20  51.  Yet there is evidence that his harassment never subsided.  Each of the Plaintiffs claims

21  that she repeatedly told him to stop harassing her, yet he continued to do so, despite the

22  obvious impropriety of an adult man harassing minors.  A reasonable jury could determine

23  by clear and convincing evidence that Plaintiffs are entitled to punitive damages from

24  Ehresman.

25       With regards to GLC, however, nothing in the record indicates that the company

26  engaged in consciously malicious or outrageous acts of misconduct or acted with an evil

27  mind.  As already noted, GLC's unresponsiveness to Plaintiffs' complaints demonstrates

28  corporate incompetence for which there is a remedy, including punitive damages under Title

VII.  But Plaintiffs cannot satisfy the legal standard or burden of proof for punitive damages against GLC on the state law claims.  The Court will deny summary judgment to Ehresman on the issue of state-law punitive damages and grant summary judgment to GLC.

**V.      Miscellaneous Motions**

The parties have filed various motions to strike.  Dkt. ##135, 138, 178, 204.  Because the Court does not need to decide these motions to resolve the pending motions for summary judgment, they will be denied as moot.  This ruling does not prevent the parties from raising these issues in motions in limine.

**IT IS ORDERED:**

1.      Defendants' motions for judgment (Dkt. ##149, 152, 163) are **granted in part** and **denied in part** as set forth in this order.

2.      Defendants' motions to strike (Dkt. ## 135, 138, 178, 204) are **denied** as moot.

2.      The Court will set a final pretrial conference by separate order.

DATED this 26th day of October, 2006.

_____
David G. Campbell
United States District Judge

- 21 -